Filed 12/19/25  In re J.K. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.K., a Person Coming Under the Juvenile Court Law. | |
| | D085898 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. J520720) |
| Plaintiff and Respondent, | |
| v. | |
| C.A., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Daniela A. Reali, Judge.  Affirmed.

Diana W. Prince, under appointment by the Court of Appeal, for Defendant and Appellant.

David J. Smith, Acting County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Natasha C. Edwards, Deputy County Counsel, for Plaintiff and Respondent.

C.A. (Mother) appeals an order renewing a domestic violence restraining order which prohibits her from contacting J.K. The original three-year restraining order was issued by the juvenile court in 2021 when, based on allegations of years of physical, emotional, and sexual abuse, the court found jurisdiction of minor J.K. under Welfare and Institutions Code[1] section 300, subdivision (a). In 2024, J.K., then a teenager with a permanent plan of foster care, asked to renew the restraining order citing Mother's long history of abuse, his ongoing mental health treatment, and his fear that Mother would harm him without a restraining order in place.

Mother contends there was insufficient evidence to support a finding that J.K. had a reasonable apprehension of future abuse. Mother further argues that the negative burdens of the restraining order on Mother's ability to obtain housing and employment outweigh the benefits of such an order. We disagree and affirm the order.

BACKGROUND

A.    *Initiation of Dependency Proceeding*

On April 19, 2021, J.K. arrived at a friend's house "disheveled" and upset. He said Mother beat him, choked him, and threatened him with a knife before he ran out of his house without shoes. He had a red mark on his neck that dissipated before law enforcement arrived.

J.K. told his friend's mother and a responding officer about Mother's long history of hitting him, slapping his face, hitting him with a belt, and choking him. A few weeks earlier, Mother burned J.K. by pressing a hot pan on his hand during an argument. On another occasion, Mother entered the bathroom while he was bathing and pushed his head under water for several

---

[1]    Further undesignated statutory references are to the Welfare and Institutions Code.

seconds. J.K. "broke down crying" while describing Mother's current and past abuse saying he did not know why she did these things to him.

J.K. said Mother also abused his sister, who was now an adult and in college. They tried to report Mother once, but nothing happened because Mother knew the responding social worker. Mother told the children no one would believe them.

The Agency filed a petition on behalf of J.K. pursuant to section 300, subdivision (a) alleging J.K. suffered or was at substantial risk of suffering serious physical harm inflicted non-accidentally by Mother.

In a forensic interview, J.K. detailed years of physical and verbal abuse that occurred every week. Mother would scream at him and tell him he was "a terrible kid." She hit him with the metal part of a belt, choked him, held his head underwater, hit him with a ruler to the point of bleeding, burned his hand with a hot pan, and threatened him with a knife. She also touched his private areas.

When J.K. met with the social worker in May 2021, he again recounted a consistent history of abuse. He said he was hit "too many [times] to count" and mother screamed at him, calling him names like "stupid" and "idiot." J.K. worried about the abuse he would suffer if he returned to Mother. He did not want visits or phone calls with her, instead he wanted a restraining order.

J.K.'s sister corroborated J.K.'s reports saying she also suffered abuse throughout her childhood. She believed Mother started beating J.K. more often when the sister left for college. The sister said J.K. was "absolutely not" safe with Mother because Mother could not control her anger.

B.    *Restraining Order*

J.K.'s attorney requested a restraining order to protect J.K. from Mother.  The application detailed the extensive physical abuse Mother inflicted on J.K. and his fear of Mother.  The application stated a restraining order was necessary to protect J.K.'s physical safety and emotional well-being.

At the scheduled jurisdictional and dispositional hearing, Mother requested a trial on the issues of jurisdiction, disposition, and case plan.  The court issued a temporary restraining order and added the restraining order request as a trial issue.

C.    *Jurisdictional Review Period*

Throughout the jurisdictional review period, J.K. consistently said he did not want visits or contact with Mother.  He did not want her to be his educational rights holder and he did not want her to know where he attended school.

J.K.'s therapist diagnosed him with posttraumatic stress disorder (PTSD).  The therapist created a crisis plan with J.K. to address his fear of returning to Mother's care.

Another therapist determined J.K.'s PTSD was "a very severe case" as evidenced by excessive sadness, crying, nightmares, flashbacks, and struggling to fall asleep.  J.K. became visibly anxious and upset whenever they talked about Mother.  He adamantly declined any communication or visits with mother.  The therapist did not observe any triggers for J.K.'s anxiety other than the topic of Mother or court.

Mother did not participate in services and did not communicate with the Agency before the contested jurisdiction and disposition hearing.

D.      *Contested Adjudication, Disposition, and Permanency Hearings*

On November 19, 2021, after a two-day contested adjudication and disposition hearing, the court sustained the petition and made a true finding that J.K. was a child defined by section 300, subdivision (a).  The court placed J.K. out of the home.  The court bypassed reunification services for Mother under section 361.5, subdivision (b)(6) and set a section 366.26 hearing.

The court issued a restraining order protecting J.K. from Mother for three years.  It prohibited mother from any contact with J.K. and required her to stay 100 yards away from him, his home, and his school.

At the section 366.26 hearing in April 2022, the court ordered a permanent plan of foster care for J.K.  J.K. still did not want contact with Mother.  Mother did not stay in touch with the Agency or ask about J.K.

E.      *Postpermanency Period*

J.K. did well over the next few years at a residential education program.  He excelled in school, had a job at his residential home, and participated in extracurricular activities.  He also participated in therapy.  He asked to attend a more challenging school and requested accommodations for study time and space at the residential home.

Mother did not maintain contact with the Agency.  She attended the postpermanency hearings virtually.  In April 2023, she asked her attorney to raise concerns about J.K.'s SAT preparation and his medical needs.  In August 2023, she opposed J.K.'s request to attend a different school, as well as the appointment of counsel to help J.K. advocate for his educational needs.

F.      *Restraining Order Renewal*

Shortly before the restraining order was set to expire in November 2024, J.K. filed a request to renew the restraining order.  J.K. said he was

afraid of Mother and that she would harm him if the restraining order was not renewed. He cited the history of excessive physical discipline and emotional abuse he suffered at Mother's hands, which led to posttraumatic stress, and the fact that Mother had not participated in any child abuse or parenting classes.

Mother objected to renewing the restraining order. At the restraining order hearing in January 2025, J.K. asked the court to make the restraining order permanent because he still feared Mother and he did not want contact with her. His counsel argued the restraining order could and should be renewed under Family Code section 6345, subdivision (a) without the need for a showing of further abuse.

Mother objected to a permanent restraining order and her counsel argued the restraining order should not be renewed because it was unnecessary and imposed an undue hardship on Mother's ability to secure employment and housing. Counsel argued there was no evidence of continued risk requiring protection since there had been no incidents or violations in the past three years. Additionally, counsel argued the restraining order, which is a public record, had a negative impact on Mother's housing and employment opportunities and penalized her for her past behaviors.

The court asked why a permanent restraining order was necessary considering J.K. would soon be an adult. J.K.'s counsel explained J.K. felt a permanent restraining order would be best for his mental health given the extreme abuse he endured from Mother.

The court denied the request for a permanent restraining order, but renewed the restraining order for five years. The court, after considering the totality of the circumstances, based the renewal on the fact that J.K. was a

minor dependent on the juvenile court, J.K.'s fear of Mother, and his medical treatment. Mother appealed.

## DISCUSSION

A. *General Legal Principles*

During a dependency proceeding, the juvenile court has exclusive jurisdiction to issue a restraining order prohibiting any person from "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, . . ., contacting, . . ., or disturbing the peace" of the dependent child. (§ 213.5, subd. (a).) When related to domestic violence, such restraining orders are issued in the manner provided by the Family Code for a domestic violence restraining order (DVRO). (*Ibid*; *In re A.P.* (2024) 103 Cal.App.5th 1137, 1145.)

Neither a showing of prior physical abuse nor " 'a reasonable apprehension of future physical abuse' is required" for the initial issuance of a restraining order under section 213.5, subdivision (a). (*In re Lilianna C.* (2024) 99 Cal.App.5th 638, 644 citing *In re B.S.* (2009) 172 Cal.App.4th 183, 193–194.) Since the purpose of dependency proceedings is to determine and protect the best interests of the child, the court may issue a restraining order enjoining a person, including a parent, from contacting a child "if such contact would jeopardize the child's safety" including "emotional and psychological safety." (*In re A.M.* (2019) 37 Cal.App.5th 614, 619 (*A.M.*).)

The juvenile court may extend a restraining order on the motion of any party under section 213.5, subdivision (d)(1). A court may also renew a DVRO under Family Code section 6345, subdivision (a), "upon the request of a party, either for five or more years, or permanently, at the discretion of the court, without a showing of further abuse since the issuance of the original order. . . ." Under this statute, the "legal standard for renewal . . . is whether

7

the protected party entertains a reasonable apprehension of future abuse. [Citation.] '[T]his does not mean the court must find it is more likely than not that abuse will occur if the protective order is not renewed. It only means the evidence demonstrates it is more probable than not there is a sufficient risk of future abuse to find the protected party's apprehension genuine and reasonable.' " (*Michael M. v. Robin J.* (2023) 92 Cal.App.5th 170, 179 (*Michael M.*).)

We review orders granting or denying a request to review a restraining order for abuse of discretion, deferring to the trial court's factual determinations. (*Lister v. Bowen* (2013) 215 Cal.App.4th 319, 333.) "To the extent that we are called upon to review the trial court's factual findings, we apply a substantial evidence standard of review." (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1505.)

B.    *Application*

No published cases address the standard the juvenile court must apply to extend or renew a restraining order in a dependency action under section 213, subdivision (d)(1). The parties analyze the renewal under the reasonable apprehension standard for renewing a DVRO under Family Code section 6345. This standard for renewal of a restraining order protecting a child in a dependency case could be viewed as a higher standard than is required for an initial restraining order under section 213.5. However, we need not decide this issue because substantial evidence supported the juvenile court's decision to renew the restraining order based either upon a finding that J.K. had a reasonable apprehension of future abuse or a finding that failing to renew the restraining order would jeopardize J.K.'s safety.

In evaluating a reasonable apprehension of future abuse for renewing a DVRO, the court may consider relevant factors such as (1) the findings and

8

facts underlying the original restraining order, (2) any significant changes in the circumstances that justified the original protective order, and (3) any burdens imposed on the restrained party by the protective order. (*Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1291 (*Ritchie*).)

1.     *Facts Underlying the Original Restraining Order Support Renewal*

For the first factor, the juvenile court declared J.K. a dependent of the court and issued the initial restraining order based an extensive and serious history of Mother's physical, verbal, and sexual abuse of J.K. since a tender age. Shortly before detention, Mother threatened J.K. with a knife, intentionally burned his hand with a hot pan, pushed his head under water, choked him, and beat him. The court bypassed reunification services for Mother based on a finding of severe abuse under section 361.5, subdivision (b)(6).

Mother's opening brief minimizes the incident that gave rise to detention by saying the "initial physical abuse perpetrated by Mother was a result of the circumstances at that time" arising from Mother working long hours, lack of parental financial support for J.K., and "difficulty" between Mother and J.K. about his grades, school, household chores, and being distracted by his phone while water was running in the sink. "Mother felt she 'just couldn't handle it anymore.' " She said she was trying to set up counseling services when J.K. left for his friend's house.

Even if the court found Mother's account of the incident credible, this was not the first incident of abuse. Both J.K. and his sister reported serious forms of mistreatment throughout their childhood beginning in elementary school. It is reasonable to expect such severe and prolonged instances of physical and emotional abuse could "give rise to a long-lasting fear of the perpetrator that could continue for many years." (*Michael M., supra*, 92

9

Cal.App.5th at p. 181.)  Indeed, J.K.'s therapists diagnosed severe PTSD from Mother's abuse.  J.K. became visibly anxious and upset whenever they discussed Mother, the possibility of visits with Mother, or the possibility of returning to her care.  No other triggers elicited this response.  Thus, the findings and facts supporting the initial restraining order are sufficient to establish a reasonable apprehension risk of future abuse.  (*Ritchie, supra*, 115 Cal.App.4th at p. 1291.)

Mother contends there was no evidence to support a reasonable fear she would or could *physically* abuse J.K. in the future.  This argument is unavailing.  "For a DVRO renewal, the protected party need not show a reasonable apprehension of future *physical* abuse. [Citation.] The statute defines 'abuse' broadly to include any behavior that could be enjoined under Family Code section 6320, such as harassing or disturbing the peace of the other party. [Citations.] This definition encompasses 'a multitude of behaviors' that do 'not involve any physical injury or assaultive acts.' [Citation.] Thus, 'there is no requirement that the party requesting a renewal have a fear of *physical* abuse.' " (*Michael M., supra*, 92 Cal.App.5th at p. 179.)  Minor's renewal application stated Mother's excessive physical discipline caused "emotional suffering" and led PTSD.  J.K. said he was fearful Mother would cause further psychological harm if Mother were permitted to contact him.  This is sufficient.

2.  *Circumstances Have Not Changed Significantly*

For the second factor, Mother contends circumstances for both J.K. and her have changed so the "opportunity and likelihood of future abuse has diminished to the degree they no longer support a renewal of the order."  She points to J.K.'s progress since placement at his residential education program, including his ability to advocate for his desires and needs.  She

10

contends there is no evidence he discussed Mother or his fear of her with his social worker, CASA, or therapist once he was placed at the residential school. She also states he "moved about freely on his own and with his CASA without expressing fear . . . that Mother might be tracking or searching for him."

First, under Family Code section 6345, it " 'would be anomalous to require the protected party to prove further abuse occurred in order to justify renewal of that original order. If this were the standard, the protected party would have to demonstrate the initial order had proved ineffectual in halting the restrained party's abusive conduct just to obtain an extension of that ineffectual order.' " (*Michael M., supra*, 92 Cal.App.5th at pp. 179–180.) Similarly, there can be no requirement for a protected party to prove that the restrained party was tracking or searching for the protected party, which would likely be a violation of the very order meant to protect the party.

Second, a child's resilience does not mean a restraining order is not necessary. This is particularly true where, as here, there was evidence that any contact with the restrained parent would jeopardize the child's emotional and psychological safety. (*A.M., supra*, 37 Cal.App.5th at p. 619.)

J.K. explained he wanted the restraining order renewed to protect his mental health. Without a restraining order, he was not confident Mother "would not contact him" and "would not subject him to further harm psychologically." The court renewed the restraining order based, in part, on J.K.'s mental health treatment.

There were several instances over the years where J.K. lost his temper and was involved in verbal or physical altercations with other students or staff members. In therapy sessions, J.K. was working on improving stress management skills, conflict resolution skills, and emotional regulation

strategies, particularly in scenarios he perceives as confrontational or when he feels slighted.

Although the status reports do not indicate specific discussions about Mother in therapy sessions, it is reasonable to conclude J.K.'s issues with conflict, emotional regulation, and stress are related to the trauma he suffered from Mother's abuse. For example, after J.K.'s forensic interview, he became defiant and began spiraling and acting out. Mother's counsel acknowledged J.K. has "issues when it comes to his mental health concerning his fear of the mother."

Finally, Mother's abuse over the years frequently related to arguments about school and grades. During the dependency proceedings, Mother raised questions about and objected to the schools he wanted to attend. She also questioned J.K.'s preparation for standardized tests. Based on the history of abuse as well as the questions Mother raised, it is reasonable for J.K. to fear that without a restraining order Mother would contact him to exert influence about school choice, educational performance, or career plans. This could open old wounds which would result in emotional or psychological harm and set back his mental health treatment.

Mother also contends her circumstances have changed so a restraining order is not necessary. She says she "exited" J.K.'s life after he was detained by not engaging with the social worker, not participating in her case plan, and not attempting to contact or find J.K. She also points to her desire to make telephonic court appearances in the dependency proceedings. This does not indicate Mother has moved on with her life to the point that the opportunity and likelihood of future abuse has diminished. To the contrary, it indicates she has not engaged in services to address the concerns giving rise to the DVRO.

Mother's compliance with the restraining order by not trying to contact J.K. does not mean a restraining order is not necessary. (*Michael M., supra*, 92 Cal.App.5th at p. 180.) Instead, the fact "that the initial restraining order 'proved effective [was] a good reason for seeking its renewal.' " (*Cueto v. Dozier* (2015) 241 Cal.App.4th 550, 562 quoting *Ritchie, supra*, 115 Cal.App.4th at p. 1284.)

The record indicates Mother wished to appear by video conference or telephonically due to "personal issues" that included her "strong desire not to be in the same room as the minor, as well as other triggering feelings which court brings upon her." This statement focused on her own comfort and preferences rather than what was best for J.K.

Mother also claims a restraining order is not necessary because there is no evidence she attempted to contact J.K.'s adult sister "[o]nce the older sister cut off contact with Mother." The phrasing of this argument is interesting because the sister apparently cut off contact after Mother tracked her at college and sent security and a residential assistant to her room as a means of control. Around the time of the sister's 18th birthday, Mother became angry over the sister's courseload and called her demeaning names. When the sister said she would not take this from Mother anymore, Mother sent the police to her room. Mother reported that the sister stopped speaking to Mother in October 2020, but they apparently argued again in early 2021 about the sister's college grades and attendance. J.K. said Mother was mad during the April 2021 incident because she contacted the sister who told Mother that Mother was abusive. The record is largely opaque about Mother's interaction or lack thereof with the sister after these events, but this lack of information does not support a conclusion that Mother would

13

continue to stay away from J.K. without a restraining order. Indeed, the sister told the social worker Mother was "dangerous."

As J.K. pointed out in the renewal application, there is no evidence that Mother has engaged in services to address the issues that led to detention such as parenting or child abuse classes. There is no indication Mother made any progress toward gaining insight about how her behavior harms J.K. or what was in *his* best interests. (*Cueto v. Dozier*, *supra*, 241 Cal.App.4th at p. 562.) Thus, the evidence supported the juvenile court's finding that Mother's circumstances had not changed to the point that renewal of the restraining order was unnecessary.

3.    *The Risks of Harm Outweigh Any Negative Implications for Mother*

As to the third factor, Mother's counsel argued during the hearing that the restraining order had a negative impact on Mother's employment and housing options. There is no evidence to support this statement. As of the renewal hearing date, Mother lived in the same apartment as she did since the inception of the case. Mother did not stay in contact with the Agency, but there is no evidence she lost her job or suffered adverse employment actions because of the restraining order. Additionally, Mother faced criminal charges, which likely would overshadow any negative implications from a restraining order.

The juvenile court was well within its discretion to determine the risk of harm to J.K. from not renewing the restraining order outweighed any negative impacts Mother might experience from the restraining order.

14

DISPOSITION

The order is affirmed.

                                                        RUBIN, J.

WE CONCUR:


KELETY, Acting P. J.


CASTILLO, J.